Edward R. Reines (SBN 135960)
ereines@jonesday.com
S. Christian Platt (SBN 199318)
cplatt@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:   (650) 739-3939
Facsimile:   (650) 739-3900

Jason G. Winchester (*pro hac vice* pending)
jgwinchester@jonesday.com
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone:   (312) 782-3939
Facsimile:   (312) 782-8585

Gasper J. LaRosa (*pro hac vice* pending)
gjlarosa@jonesday.com
Sabrina A. Bellantoni (*pro hac vice* pending)
sbellantoni@jonesday.com
Lauren H. Kim (*pro hac vice* pending)
lkim@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone:   (212) 326-3939
Facsimile:   (212) 755-7306

Attorneys for Defendant, Counterclaim-Plaintiff
BIOMARIN PHARMACEUTICAL INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| ASCENDIS PHARMA A/S, ASCENDIS PHARMA GROWTH DISORDERS A/S, AND ASCENDIS PHARMA, INC.,<br><br>Plaintiffs, Counterclaim-Defendants,<br><br>v.<br><br>BIOMARIN PHARMACEUTICAL INC.,<br><br>Defendant, Counterclaim-Plaintiff. | Case No. 4:25-cv-05696-YGR<br><br>**BIOMARIN'S PROPOSED NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**REDACTED VERSION OF DOCUMENT TO BE SEALED**<br><br>Date:<br>Time:          2:00 pm<br>Courtroom:  Courtroom 1, Fourth Floor<br>Judge:        Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE THAT Defendant and Counterclaim Plaintiff BioMarin Pharmaceutical Inc. ("BioMarin") will, and hereby does, by and through its counsel of record, under Federal Rule of Civil Procedure 65 and Local Rules 65-2 and 7-2, move for a limited preliminary injunction and respectfully requests that this matter be heard in Courtroom 1, 4th Floor, located at 1301 Clay Street, Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers as soon as practical. A preliminary injunction is necessary because Plaintiff and Counterclaim Defendant Ascendis Pharma A/S, Ascendis Pharma Growth Disorders A/S, and Ascendis Pharma, Inc. (collectively, "Ascendis") is threatening to launch its Yuviwel® (navepegritide) product before the International Trade Commission ("ITC") can complete its investigation of whether Yuviwel® infringes BioMarin's United States Reissue Patent No. RE48,267 ("RE'267") in violation of 19 U.S.C. §1337. *See In the Matter of Certain Drug Product Containing C-Type Natriuretic Peptide Variants, and Components Thereof*, Inv. No. 337-TA-1447.

The ITC trial is set for April 20-24, 2026, and the final initial determination of the Commission is due by August 21, 2026. BioMarin seeks a preliminary injunction to prevent the launch of Yuviwel® that lasts only until Chief Administrative Law Judge Cheney issues the final initial determination by August, to preserve the status quo and prevent serious confusion in the marketplace among patients, caregivers, and doctors, as well as irreparable harm to BioMarin.

This motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Edward R. Reines ("Reines Decl."), the Declaration of Dr. Gianfranco Pasut, the Declaration of Tejas Kheradiya, the Declaration of Michael Ash, supporting exhibits, and the proposed Preliminary Injunction Order.[1]

---

[1] All numbered exhibits are attached to the Declaration of Edward R. Reines in Support of Administrative Motion to Lift Discretionary Stay and Set Preliminary Injunction Briefing Schedule, BioMarin's Proposed Answer to Complaint and Counterclaim for Patent Infringement, BioMarin's Proposed Notice of Motion and Motion for a Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof.

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 3

        A.      BioMarin's Scientists Invented The First-Ever FDA-Approved Treatment
                For Achondroplasia ............................................................................................ 4

        B.      BioMarin's Inventions Are Protected By The RE'267 Patent .............................. 5

        C.      Ascendis's Yuviwel® ......................................................................................... 5

III.    PROCEDURAL BACKGROUND ............................................................................. 6

        A.      The ITC Investigation ....................................................................................... 6

IV.     ARGUMENT ............................................................................................................ 6

        A.      BioMarin Is Likely To Succeed On The Merits Of Its Patent Infringement
                Claims And Has Raised Serious Questions Going To Those Merits ..................... 7

                1.      Yuviwel® Infringes The RE'267 Patent ................................................... 8

                        (a)     Claim 50 Is Infringed By The Use Of Yuviwel® As Directed
                                By Ascendis, And Ascendis Actively Induces That
                                Infringement ................................................................................ 9

                        (b)     Claim 41 is Infringed By Yuviwel® ............................................ 11

                2.      Ascendis Has No Likely Successful Validity Challenge .......................... 13

        B.      BioMarin Would Suffer Irreparable Harm Absent An Injunction ....................... 15

        C.      The Balance of Harms Leans Sharply To BioMarin and Favors
                Maintaining The Status Quo Until The ITC's Final Initial Determination
                On The Merits .................................................................................................. 20

        D.      The Public Interest Strongly Favors The Limited Injunction Requested ............. 21

V.      CONCLUSION ....................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott Lab'ys. v. Andrx Pharms., Inc.*,
473 F.3d 1196 (Fed. Cir. 2007).................................................................................................. 8

*Abbott Lab'ys v. Sandoz, Inc.*,
500 F. Supp. 2d 807 (N.D. Ill. 2007), *aff'd*, 544 F.3d 1341 (Fed. Cir. 2008).................... 19, 23

*Albany Molecular Rsch., Inc. v. Dr. Reddy's Lab'ys, Ltd.*,
Civil Action No. 09-4638, 2010 WL 2516465 (D.N.J. June 14, 2010) ................................. 16

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)................................................................................................. 20

*Am. Parking Meter Advert., Inc. v. Visual Media, Inc.*,
848 F.2d 1244 (Fed. Cir. 1988), *overruled on other grounds by Markman v.
Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)........................................................ 8

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014)................................................................................................. 15

*AstraZeneca LP v. Apotex, Inc.*,
1:09-cv-01518 (D.N.J. Mar. 31, 2009), Dkt. No. 45, Order for Temporary
Relief (Ex. 27).......................................................................................................................... 3

*AstraZeneca LP v. Apotex, Inc.*,
623 F. Supp. 2d 579 (D.N.J. 2009) 2009), *supplemented*,
623 F. Supp. 2d 615 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010)..................... 17, 18

*AstraZeneca LP v. Apotex, Inc.*,
623 F. Supp. 2d 615 (D.N.J. 2009), *aff'd,* 633 F.3d 1042 (Fed. Cir. 2010)............................ 3

*Bayer AG v. Elan Pharm. Rsch. Corp.*,
212 F.3d 1241 (Fed. Cir. 2000)................................................................................................. 9

*Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*,
996 F.3d 1302 (Fed. Cir. 2021)................................................................................................. 6

*Cordis Corp. v. Medtronic, Inc.*,
780 F.2d 991 (Fed. Cir. 1985)................................................................................................. 20

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)............................................................................................... 18

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................................................................. 6

*Eisai Co., Ltd v. Teva Pharms. USA, Inc.*,
Civ. No. 05–5727, 2008 WL 1722098 (D.N.J. Mar. 28, 2008) ............................................. 23

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
845 F.3d 1357 (Fed. Cir. 2017)............................................................................................... 10

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
609 F. Supp. 2d 786 (S.D. Ind. 2009) .......................................................................... 3, 19, 23

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
No. 1:06-cv-1017, 2009 WL 10875059 (S.D. Ind. Mar. 09, 2009) ......................................... 3

*Exeltis USA, Inc. v. Lupin Ltd.*,
No. 1:22-cv-00434 (D. Del. Apr. 01, 2022), Dkt. No. 367 (Ex. 28)........................................ 3

*Fitness IQ, LLC v. TV Prods. USA, Inc.*,
    No. 10-CV-2584, 2011 WL 13356174 (S.D. Cal. Mar. 11, 2011) ..................................... 7, 8

*Fraihat v. U.S. Immigr. & Customs Enf't*,
    16 F.4th 613 (9th Cir. 2021) .......................................................................................... 7

*Fresenius Kabi USA, LLC v. Fera Pharms., LLC*,
    No. 15-CV-3654, 2016 WL 5348866 (D.N.J. Sept. 23, 2016) .............................................. 20

*Gilder v. PGA Tour, Inc.*,
    936 F.2d 417 (9th Cir. 1991).................................................................................... 8, 15

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
    7 F.4th 1320 (Fed. Cir. 2021)..................................................................................... 11

*Hoffmann-La Roche Inc. v. Cobalt Pharms. Inc.*,
    Civil Action No. 07–4539, 2010 WL 4687839 (D.N.J. Nov. 10, 2010),
    *modified sub nom., Hoffmann-La Roche Inc. v. Watson Lab'ys, Inc.*, Civil
    Action No. 07-4539, 2012 WL 458435 (D.N.J. Feb. 9, 2012) ............................................. 23

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
    877 F.3d 1361 (Fed. Cir. 2017) ...................................................................................... 14

*Hybritech Inc. v. Abbott Laby's*,
    849 F.2d 1446 (Fed. Cir. 1988)..................................................................................... 20

*i4i Ltd P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ......................................... 15

*Illumina, Inc. v. BGI Genomics Co.*,
    No. 19-CV-03770, 2020 WL 3186921 (N.D. Cal. June 15, 2020) .................................. 20, 21

*Illumina, Inc. v. Qiagen, N.V.*,
    207 F. Supp. 3d 1081 (N.D. Cal. 2016) .......................................................... 7, 8, 18

*In re Aflibercept Pat. Litig.*,
    No. 1:22-CV-61, 2024 WL 3286062 (N.D.W. Va. May 17, 2024) ........................................ 3

*In re Aflibercept Pat. Litig.*,
    No. 1:23-CV-106, 2024 WL 3286061 (N.D.W. Va. May 17, 2024) ...................................... 3

*In re Aflibercept Pat. Litig.*,
    No. 1:23-CV-97, 2024 WL 3423047 (N.D. W. Va. July 9, 2024)................................... 18, 21

*In re Aflibercept Pat. Litig.*,
    No. 1:24-MD-3103-TSK, 2024 WL 3422971 (N.D.W. Va. June 24, 2024),
    *aff'd sub nom., Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896
    (Fed. Cir. 2025)............................................................................................................. 3

*In re Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same and
    Certain Prods. Containing Same*,
    Inv. No. 337-TA-1145 (U.S.I.T.C., Dec. 16, 2020)...................................................... 6

*In the Matter of Certain Drug Product Containing C-Type Natriuretic Peptide
    Variants, and Components Thereof*,
    Inv. No. 337-TA-1447. ................................................................................................ 6

*Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*,
    26 F.3d 1112 (Fed. Cir. 1994)...................................................................................... 13

*Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*,
    No. 14-cv-02864, 2018 WL 3036759 (N.D. Cal. June 9, 2018), *aff'd*, 773 F.
    App'x 623 (Fed. Cir. 2019)........................................................................................... 19

*Mahurkar v. C.R. Bard, Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996) ............................................................................................. 13

*Masimo Corp. v. True Wearables, Inc.*,
   No. 2021-2146, 2022 WL 205485 (Fed. Cir. Jan. 24, 2022) ............................................... 7

*Monsanto Co. v. Scruggs*,
   249 F. Supp. 2d 746 (N.D. Miss. 2001) .............................................................................. 23

*Natera, Inc. v. NeoGenomics Lab'ys., Inc.*,
   106 F.4th 1369 (Fed. Cir. 2024) ........................................................................................... 8

*Novozymes A/S v. Genencor Int'l, Inc.*,
   474 F. Supp. 2d 592 (D. Del. 2007) .................................................................................... 19

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005) ............................................................................... 6, 21, 23

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012) .......................................................................................... 18

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*,
   237 F.3d 1359 (Fed. Cir. 2001) ............................................................................................ 7

*Riverwood Intern. Corp. v. R.A. Jones & Co., Inc.*,
   324 F.3d 1346 (Fed. Cir. 2003) .......................................................................................... 14

*Sanofi–Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006) .......................................................................................... 23

*Sanofi v. Watson Lab'ys Inc.*,
   875 F.3d 636 (Fed. Cir. 2017) ...................................................................................... 10, 11

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
   748 F.3d 1159 (Fed. Cir. 2014) ....................................................................................... 7, 8

*Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018) .......................................................................................... 11

*Wyeth LLC v. Astrazeneca Pharms. LP*,
   No. 21 C 1338, 2024 WL 3823006 (D. Del. Aug. 14, 2024) .............................................. 10

**STATUTES**

35 U.S.C.
   §§ 101, 103, 112 ................................................................................................................... 15
   § 102(e) ........................................................................................................................ 13, 14
   § 112 .................................................................................................................................... 13
   § 271(b) ............................................................................................................................... 10
   § 282 .................................................................................................................................... 13
   § 283 ...................................................................................................................................... 6

**OTHER AUTHORITIES**

37 C.F.R. 1.291 .......................................................................................................................... 13

Fed. R. Civ. P. 65 ........................................................................................................................ 7

Manual of Patent Examining Procedure 1901.02 ...................................................................... 13

**GLOSSARY**

| Abbreviation | Description |
|---|---|
| Ascendis | Collectively, Plaintiff/Counterclaim Defendants Ascendis Pharma A/S, Ascendis Pharma Growth Disorders A/S, and Ascendis Pharma, Inc. |
| Ash Decl. | Declaration of Michael Ash, Ex. 24 (incorporated herein in its entirety) |
| BioMarin | Defendant/Counterclaim Plaintiff BioMarin Pharmaceutical Inc. |
| cGMP | Cyclic guanosine monophosphate |
| CNP | C-type natriuretic peptide |
| FDA | Food and Drug Administration |
| FGFR3 | Fibroblast growth factor receptor 3 gene |
| ITC or Commission | International Trade Commission |
| Kheradiya Decl. | Declaration of Tejas Kheradiya, Ex. 25 (incorporated herein in its entirety) |
| NPR-B | Natriuretic peptide receptor B |
| NPPC | Natriuretic peptide precursor C gene |
| Pasut Decl. | Declaration of Dr. Gianfranco Pasut, Ex. 26 (incorporated herein in its entirety) |
| PEG | Polyethylene glycol |
| POSA | Person of Ordinary Skill in the Art |
| PTO or Patent Office | United States Patent and Trademark Office |
| RE'267 patent | U.S. Reissue Patent No. RE48,267, which is owned by BioMarin and which expires May 20, 2030 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

BioMarin seeks a carefully-limited, but important injunction that would last at most until this August, absent further extension by the Court.  This measured motion is necessary because, on February 27, 2026, Ascendis announced that it will launch Yuviwel® to compete with BioMarin's patented Voxzogo® product—the first ever FDA-approved treatment for children with achondroplasia (the most common type of dwarfism).

Ascendis's threatened launch is problematic because it is scheduled for the "early part of the second quarter of '26."  *See, e.g.*, Ex. 4, Ascendis News Conference Regarding Yuviwel® Approval (Ascendis's CEO stating publicly that "[w]e will be in the market.  There is no doubt of that.").  This is a cynical attempt by Ascendis to rush its drug to market before the ITC has a chance to resolve the parallel investigation into whether Yuviwel® infringes BioMarin's RE'267 patent.  Trial is set for April 20–24 in the ITC, and Chief Judge Cheney's final initial determination will issue by August 21.  Ex. 2, Order No. 25 Amending Procedural Schedule.  The ITC does not have statutory authority to prevent Ascendis's preemptive maneuver at this point in its investigation, so BioMarin has no choice but to approach this Court.

Ascendis knows that, if BioMarin wins at the ITC (as it should), then the ITC is authorized to enter orders barring importation and sale of Yuviwel® in this country.  But the decision whether to impose such orders, and in what scope, is guided by the public interest.  Ascendis's motivation in racing to market before Chief Judge Cheney can hear and decide the issues is apparently to manufacture a public interest argument against exclusion where none currently exists.  Namely, Ascendis hopes to launch the product before an adverse ruling, cause patients who are currently well-treated on Voxzogo® to be switched over to Yuviwel®, and then argue that it would be against the public interest to enter an exclusion order precisely because the ITC's remedial orders would harm patients now using the drug—a situation entirely of Ascendis's own making.  *See* Ex. 4, Ascendis News Conference Regarding Yuviwel® Approval at 7 (Ascendis's CEO stating "[t]here is even switch guidance within this U.S. prescribing information.  Start once-weekly YUVIWEL

on the day after completing the last dose of daily CNP therapy."). It is more gamesmanship from Ascendis, this time with children and their families as the victims.

After Chief Judge Cheney issues his decision, the parties will have the benefit of the result from a full investigation that has consumed enormous resources (30+ fact depositions and 15 experts) to get to this late point. Until then, by protecting the status quo, a preliminary injunction preventing Ascendis's Yuviwel® launch until August would avoid harmful confusion for the achondroplasia community. The introduction of a new drug to that community, backed by Ascendis's promised full-court marketing attack on BioMarin's Voxzogo® therapy, only to have the drug excluded in whole or part in just a few months would cause great confusion and avoidable harm. And for little reason other than Ascendis's litigation maneuvering and desire for a few-month commercial edge. Patients, caregivers, and physicians will have no way to know whether Yuviwel® is actually available as a lasting therapy, and patient care will inevitably be disrupted by Ascendis's "switching" efforts. Moreover, Ascendis plans to market its own product by attacking Voxzogo® may discourage use of that important medicine even though it is likely the ITC will later remove Yuviwel® from the market.

There is simply no good reason to allow Ascendis to create havoc in this vulnerable community, and to disrupt the medical care of children, on the eve of a trial that will decide whether Yuviwel® can even be imported into this country before the RE'267 patent expires in 2030. If Ascendis launches and makes good on its pledge to switch patients who are well-treated on Voxzogo® over to Yuviwel®, then it forces BioMarin into a Catch-22 position before the ITC: either insist on its statutory rights under the RE'267 patent and seek an exclusion order that would mean these patients could no longer receive Yuviwel®, or else capitulate to allow such patients to stay on Yuviwel®, thus unjustly rewarding Ascendis for its blatant acts of infringement and all the uncertainty it will sow.

BioMarin's infringement proof is strong (indeed, Ascendis's own public descriptions of its product confirm infringement), and Ascendis has no likelihood of proving invalidity. To the contrary, Ascendis already challenged the validity of the RE'267 patent by lodging a protest during contested reissue proceedings before the Patent Office. Ascendis was allowed to, and was

motivated to, raise any invalidity argument it thought was viable as a part of that protest. The few arguments that it did elect to raise were rejected, and the PTO allowed the RE'267 patent to issue over Ascendis's objections, further underscoring the statutory presumption of validity here. Ascendis now hurls additional invalidity theories in the ITC, but none of these make-weight arguments were deemed good enough to be included in the protest at the PTO, and none can fend off the limited injunction that BioMarin seeks here. Courts have not hesitated to block introduction of pharmaceutical drug products accused of infringement where there is a likelihood of success and the other factors are met. *See, e.g.*, *In re Aflibercept Pat. Litig.*, No. 1:22-CV-61, 2024 WL 3286062 (N.D.W. Va. May 17, 2024); *In re Aflibercept Pat. Litig.*, No. 1:23-CV-106, 2024 WL 3286061 (N.D.W. Va. May 17, 2024); *In re Aflibercept Pat. Litig.*, No. 1:24-MD-3103-TSK, 2024 WL 3422971 (N.D.W. Va. June 24, 2024), *aff'd sub nom., Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896 (Fed. Cir. 2025); *AstraZeneca LP v. Apotex, Inc.*, 1:09-cv-01518 (D.N.J. Mar. 31, 2009), Dkt. No. 45, Order for Temporary Relief (Ex. 27); *AstraZeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 615 (D.N.J. 2009), *aff'd,* 633 F.3d 1042 (Fed. Cir. 2010); *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, No. 1:06-cv-1017, 2009 WL 10875059 (S.D. Ind. Mar. 09, 2009); *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 609 F. Supp. 2d 786 (S.D. Ind. 2009); *Exeltis USA, Inc. v. Lupin Ltd.*, No. 1:22-cv-00434 (D. Del. Apr. 01, 2022), Dkt. No. 367 (Ex. 28). This Court should do the same here.[2]

## II.    FACTUAL BACKGROUND

The facts are straightforward. BioMarin discovered, developed, tested, and ultimately secured FDA approval of Voxzogo®, the first-ever treatment for achondroplasia. The Patent Office awarded BioMarin the RE'267 patent for its important discoveries. After BioMarin's groundbreaking investment created this new therapy, Ascendis could have done the work to develop its own unique product, but it chose instead to build its competing drug using a compound that is explicitly claimed in BioMarin's RE'267 patent.

---

[2] After the ITC's initial determination, BioMarin requests there be a status conference at the Court's earliest convenience to address whether the injunction should be further extended.

To protect its inventions, and because Ascendis planned to fuel its infringement via importation, BioMarin sought help from the ITC, which reviewed the matter and decided to institute an investigation. The ITC trial will take place next month. *See* Dkt No. 1-2, BioMarin's ITC Complaint; Ex. 2, Order No. 25: Amending Procedural Schedule. Rather than allow the ITC to consider the merits of the dispute and render its ruling before the infringing product hits the market, however, Ascendis has announced that it is launching Yuviwel® "during the early part of the second quarter of 2026." Ex. 1, Yuviwel® FDA Approval Press Release.

### A. BioMarin's Scientists Invented The First-Ever FDA-Approved Treatment For Achondroplasia

Achondroplasia is a rare genetic condition, impacting about 1 in every 25,000 births. Pasut Decl. ¶ 24. People living with achondroplasia have short stature (without treatment, around 4 feet as adults), and typically experience a variety of conditions that negatively impact their overall health and quality of life. Ash Decl. ¶ 23. These include stenosis (a narrowing of the channel in the spine that contains the spinal cord, often including a narrowing of the aperture through which the spinal cord passes into the skull), abnormal morphology of the facial bones, bowing of the tibial bones, abnormal spinal curvature, obstructive sleep apnea, and chronic pain, among others. *Id*.

In simplest terms, achondroplasia involves a mutation that causes overactivity of a gene (FGFR3) that slows bone growth, which overpowers the activity of the peptide (CNP) that promotes growth. Pasut Decl. ¶¶ 25–26 and 29. Prior to BioMarin's innovations, treatment was limited to risky paths like surgical limb lengthening or, in some countries, growth hormone therapy. *Id*. ¶ 28. Skilled artisans were generally aware of the role of CNP and FGFR3 in bone growth, including in persons with achondroplasia. But conventional wisdom was that a treatment option using the naturally-occurring peptide (CNP-22) was not viable due to its short half-life, which would limit its efficacy. Indeed, when Dr. William Wilcox, a Professor of Human Genetics and Pediatrics at Emory University, first approached BioMarin to discuss his research regarding the impact of CNP on dwarfism in mouse studies, he noted that at least one other pharmaceutical company had rejected the idea of pursuing a CNP-based therapy as too difficult to deserve an investment. *See* Ex. 29, Declaration of Wilcox at 3.

Notwithstanding this deep-seated skepticism, BioMarin's scientists took up the charge and, after extensive experimentation, discovered and tested a number of novel variants of CNP that offered a longer half-life and thus more viability for use in drug therapy. These discoveries led to Voxzogo®, the first FDA-approved therapy for the treatment of achondroplasia. Voxzogo® was approved on November 19, 2021, and is now indicated for use in children with achondroplasia from birth until their epiphyses (growth plates) have closed. Pasut Decl. ¶ 33. In addition to demonstrated gains in linear growth, Voxzogo® also has been shown to have important positive impacts on several known comorbidities experienced by persons living with achondroplasia, including better body proportionality, reduced tibial bowing, and overall gains in physical function and independence. Ash Decl. ¶ 28. Voxzogo® is the most tested achondroplasia therapy, and its safety and efficacy have been consistently demonstrated in the real world as well as in scientific studies. *Id.* ¶ 64.

**B.     BioMarin's Inventions Are Protected By The RE'267 Patent**

The BioMarin scientists were awarded patents recognizing their inventions, including the RE'267 patent—which even went through the rigor of contested reissue proceedings. *See* Dkt. No. 1-1. The RE'267 patent generally relates to the novel variants of CNP, specifically including Pro-Gly-CNP 37 (the active ingredient in Voxzogo®) and CNP 38 (the active ingredient in Yuviwel®), as well as methods of using these variants in the treatment of bone-related disorders such as achondroplasia. In addition to the CNP variants, the RE'267 patent also teaches and claims their use in formulations involving the attachment of the peptide to polymers such as polyethylene glycol ("PEG"). *See, e.g.*, Dkt. No. 1-1, RE'267 10:33–43 ("The disclosure contemplates use of hydrophilic or water soluble polymers (e.g., PEG molecules) that may vary in type … linkage … conjugation site … and length.").

**C.     Ascendis's Yuviwel®**

On March 31, 2025, Ascendis submitted an application seeking FDA approval to market and sell Yuviwel® (navepegritide) in the U.S. for the treatment of children with achondroplasia. Ex. 5, Yuviwel® NDA Press Release. The active ingredient in Yuviwel® is CNP 38, one of the variants specifically claimed in BioMarin's RE'267 patent. *See, e.g.*, Ex. 6, Yuviwel® Label at

Section 11; Pasut Decl. ¶¶ 46, 51–53, 56 and 58.  To achieve a sustained release of the drug, the CNP 38 in Yuviwel® is attached to a PEG carrier via a linker.  *See, e.g.*, Ex. 6, Yuviwel® Label at Section 11; Pasut Decl. ¶¶ 46, 51–53 and 55–59.  On February 27, 2026, the FDA approved Ascendis's application.  Ex. 1, Yuviwel® FDA Approval Press Release.

## III.   PROCEDURAL BACKGROUND

### A.   The ITC Investigation

On May 2, 2025, the ITC instituted Section 337 proceedings to investigate whether Yuviwel® infringes the RE'267 patent.  *See In the Matter of Certain Drug Product Containing C-Type Natriuretic Peptide Variants, and Components Thereof*, Inv. No. 337-TA-1447.  The ITC proceedings are very advanced—the parties have completed a *Markman* Hearing, fact discovery (including 30+ depositions) and expert discovery (15 total experts) have closed, and the matter will proceed to trial April 20–24, 2026.  Ex. 2, Order No. 25: Amending Procedural Schedule.  Chief Judge Cheney will return the ITC's final initial determination by August 21, 2026, and a decision of the full Commission is targeted for December 21, 2026.  *Id.*

If the ITC finds a violation, it has the authority to issue remedial orders barring Ascendis from importing Yuviwel® into the United States, or from offering to sell or selling it here.  *See, e.g.*, *In re Certain Botulinum Toxin Prods., Processes for Mfg. or Relating to Same and Certain Prods. Containing Same*, Inv. No. 337-TA-1145, (U.S.I.T.C., Dec. 16, 2020); *Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 996 F.3d 1302, 1304 (Fed. Cir. 2021) (affirming the ITC Commission's limited exclusion order).

## IV.   ARGUMENT

"Courts have the power to grant injunctions to prevent the violation of patent rights." *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) ("[W]hether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."); 35 U.S.C. § 283 (courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the

court deems reasonable."); Fed. R. Civ. P. 65 (giving courts the authority to issue a preliminary injunction). "[T]he law of the regional circuit" applies to "[t]he grant, denial, or modification of a preliminary injunction," while "dominant effect" is given "to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014).

The Ninth Circuit authorizes two paths to a preliminary injunction. *See Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). In the first four-factor test, the party moving for a preliminary injunction "must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Id*. (citation omitted); *see also Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001). In the second "alternative" sliding-scale test, "'serious questions going to the merits' and a balance of the hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat*, 16 F.4th at 635 (cleaned up) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)); *see also Masimo Corp. v. True Wearables, Inc.*, No. 2021-2146, 2022 WL 205485, at *1 (Fed. Cir. Jan. 24, 2022).

District courts have issued a preliminary injunction in patent cases upon satisfaction of either standard. *See, e.g.*, *Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1094 (N.D. Cal. 2016) (granting preliminary injunction under the four-factor analysis); *Fitness IQ, LLC v. TV Prods. USA, Inc.*, No. 10-CV-2584, 2011 WL 13356174, at *5 (S.D. Cal. Mar. 11, 2011) (granting preliminary injunction under sliding-scale test).

The application of either equitable test strongly supports the narrowly-tailored injunction that BioMarin seeks here, particularly in these extraordinary circumstances.

### A.    BioMarin Is Likely To Succeed On The Merits Of Its Patent Infringement Claims And Has Raised Serious Questions Going To Those Merits

A reasonable likelihood of success requires a patentee to show that "(1) it will likely prove infringement and (2) its infringement claim will likely withstand challenges to the validity and

enforceability of the patents." *Natera, Inc. v. NeoGenomics Lab'ys., Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024) (quoting *Purdue Pharma*, 237 F.3d at 1363). Each prong is met here. At the very least, BioMarin raises "serious questions going to the merits of its patent infringement claim" that suffice under the sliding-scale test in conjunction with the irreparable harm discussed below. *Fitness IQ*, 2011 WL 13356174, at *5. "For purposes of injunctive relief, 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (citation omitted) ("Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." (citation omitted) (internal quotation marks omitted)).

### 1.    Yuviwel® Infringes The RE'267 Patent

The likelihood of success showing must be made as to "at least one valid and enforceable patent claim." *Abbott Lab'ys. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007); *Trebro Mfg.*, 748 F.3d at 1166 ("To prove a likelihood of success on the merits, a patentee must prove that success in establishing infringement is 'more likely than not.'" (citation omitted)); *Am. Parking Meter Advert., Inc. v. Visual Media, Inc.*, 848 F.2d 1244 (Fed. Cir. 1988) ("The grant of a preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer." (quoting *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987))), *overruled on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995); *Illumina*, 207 F. Supp. 3d at 1087 ("Likelihood of success on the merits is a probability of fifty-one percent or more. That leaves a forty-nine percent likelihood that the accused infringer would succeed, which leaves more than enough room for a 'substantial question.'").

Here, infringement is not seriously disputable. Ascendis could have developed a new product, but instead it chose to copy BioMarin's invention directly and intentionally, using a CNP variant specifically claimed in the RE'267 patent in a sustained release formulation that is also claimed in the patent. To avoid the consequences of this choice, Ascendis tried to knock out the RE'267 patent during contested reissue proceedings, but failed. The patent stands, and

infringement is clear.   As shown in the attached declaration of Dr. Gianfranco Pasut—a distinguished professor who has dedicated his career to the study of peptides like CNP and their use in drug products—a POSA would readily understand the claim terms of the RE'267 patent, and those terms read neatly on Yuviwel®.  *See* Pasut Decl. Section IX.

BioMarin alleges that Ascendis's Yuviwel® product infringes claims 32, 34, 41, 43, 50 and 55 of the RE'267 patent.  For purposes of this Motion, however, BioMarin will focus on claims 50 and 41.

(a) <u>Claim 50 Is Infringed By The Use Of Yuviwel® As Directed By Ascendis, And Ascendis Actively Induces That Infringement</u>

The invention of Claim 50 is:

> The method of claim 21, wherein the CNP variant is (SEQ ID NO: 160) LQEHPNARKYKGANKKGLSKGCFGLKLDRIGSMSGLGC (CNP-38).

Dkt. No. 1-1, RE'267 at 278:53–56.

The invention of Claim 21 is:

> A method of stimulating cGMP production in a cell expressing natriuretic peptide receptor B (NPR-B) comprising contacting the cell expressing NPR-B with a CNP variant selected from the group consisting of . . . (SEQ ID NO: 160) LQEHPNARKYKGANKKGLSKGCFGLKLDRIGSMSGLGC (CNP-38)….

Dkt. No. 1-1, RE'267 at 272:14–273:14.

There is no dispute that the active ingredient in Yuviwel® is CNP 38, also described as SEQ ID NO: 160.  *See, e.g.*, Pasut Decl. ¶¶ 46, 51–53, 56 and 58.  Ascendis's labeling for Yuviwel® acknowledges this.  Ex. 6, Yuviwel® Label at Section 11 ("The amino acid sequence of the CNP moiety is identical to the 38 amino acid sequence of residues 89-126 of human CNP.").  These statements in the labeling constitute binding admissions, particularly given that Ascendis has attested to the truth of these statements under penalty of perjury and would face civil and criminal penalties if the description of its product were incorrect.  *See Bayer AG v. Elan Pharm. Rsch. Corp.,* 212 F.3d 1241, 1248–49 (Fed. Cir. 2000).  The remaining elements of the claim are similarly uncontroverted.  The essential function of Yuviwel® is that its active ingredient, CNP 38/SEQ ID NO: 160, contacts cells in the patient containing the NPR-B receptor (which is the receptor for CNP), thereby stimulating the production of cGMP—the messenger molecule that signals bones to

grow. *See, e.g.*, Pasut Decl. ¶¶ 75–79. This function is known and is confirmed by Ascendis in the FDA-approved labeling. Ex. 6, Yuviwel® Label at Section 12 ("CNP released from navepegritide has the same receptor binding affinity and activity as endogenous CNP. CNP binds to natriuretic peptide receptor-B (NPR-B), which inhibits the mitogen activated protein kinase signaling (MAPK) pathway … CNP released from navepegritide binds to NPR-B, stimulating an increase in cyclic guanosine monophosphate (cGMP) and signaling through protein kinase G, resulting in an inhibition of the MAPK signaling pathway and thereby antagonizing the overactive FGFR3 signaling in achondroplasia.").

Accordingly, when a healthcare practitioner, a patient, or a caregiver administers an injection of Yuviwel®, he or she will practice every element of Claim 50, and thus will directly infringe that claim. *See, e.g.*, *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1365–68 (Fed. Cir. 2017) (affirming district court's finding that physicians directly infringe method of treatment claim by following drug product label). Ascendis actively induces healthcare practitioners, patients, and caregivers to do so, and thus is equally liable. *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); *see also Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 643 (Fed. Cir. 2017) (affirming inducement finding where "the induced act will be the administration of dronedarone by medical providers to patients meeting the criteria set forth in the [asserted claims]" given the "marketing by Watson and Sandoz of their generic dronedarone drugs with the label [at issue]."); *Wyeth LLC v. Astrazeneca Pharms. LP*, No. 21 C 1338, 2024 WL 3823006, at *3, *6 (D. Del. Aug. 14, 2024), *judgment entered*, No. 21-CV-1338, 2024 WL 6864467 (D. Del. Aug. 14, 2024) (rejecting post-trial challenge to jury's finding of induced infringement based on instructions in AstraZeneca's labeling).

Ascendis is aware of the RE'267 patent; it lodged a failed protest against that patent at the Patent Office years ago, and has been actively litigating claims under that patent at the ITC since April 2025. Nor can there be any doubt that Ascendis knows that the use of Yuviwel® as directed will infringe Claim 50, since each element of the claim is expressly or inherently disclosed in Ascendis's own labeling. Finally, Ascendis's labeling constitutes the express instructions from the company to users of Yuviwel® about exactly what the product is, what it does, and how to use it.

Courts have uniformly recognized that drug labeling is evidence of affirmative encouragement by a company like Ascendis, and can demonstrate active inducement as to method of treatment claims. *See GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1334 (Fed. Cir. 2021) ("Our precedent has consistently held that, when a product is sold with an infringing label or an infringing instruction manual, such a label is evidence of intent to induce infringement."); *Sanofi*, 875 F.3d at 646 ("The content of the label in this case permits the inference of specific intent to encourage the infringing use"); *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018) ("The contents of the label itself may permit the inference of specific intent to encourage, recommend, or promote infringement.").  In this case, Ascendis's statements in the labeling are more than sufficient to establish the requisite likelihood (more likely than not) that BioMarin will succeed on its claim of inducement.

(b)    Claim 41 is Infringed By Yuviwel®

The invention of Claim 41 is:

> The sustained release formulation of claim 18, wherein the CNP variant is (SEQ ID NO: 160) LQEHPNARKYKGANKKGLSKGCFGLKLDRIGSMSGLGC (CNP-38).

Dkt. No. 1-1, RE'267 at 277:60–64.

The invention of Claim 18 is:

> A sustained release CNP variant formulation comprising a synthetic polymeric group coupled to the CNP variant through a hydrolysable linkage, wherein the CNP variant is selected from the group consisting of … (SEQ ID NO: 160) LQEHPNARKYKGANKKGLSKGCFGLKLDRIGSMSGLGC (CNP-38)….

Dkt. No. 1-1, RE'267 at 271:4–272:5.

As with Claim 50, there is no dispute that Yuviwel® utilizes CNP 38 (SEQ ID NO: 160). The labeling makes clear that Yuviwel® is a formulation, meaning a mixture of the active ingredient with other ingredients.  Ex. 6, Yuviwel® Label at Section 11 (Yuviwel® formulation is CNP 38 plus inert ingredients including succinic acid, trehalose dihydrate, tromethamine, and hydrochloric acid.)  And Ascendis has admitted that Yuviwel® is a conjugate that "provide[s] sustained release of C-type natriuretic peptide (CNP) for once-weekly therapy, addressing the pathology leading to aberrant skeletal development in achondroplasia."  Pasut Decl. ¶ 70; *see* Ex. 6, Yuviwel® Label at

Section 11 ("Navepegritide is a prodrug of active CNP consisting of a CNP moiety transiently conjugated to two branched 20 kDa methoxy polyethylene glycol (mPEG) moieties via a proprietary TransCon® Linker.").

The only remaining question is whether Yuviwel® further comprises a "synthetic polymeric group coupled to [the CNP 38] through a hydrolysable linkage," and the answer is an unequivocal "yes." First, it is undisputed that the CNP 38 in the Yuviwel® product is coupled to PEG, which is a synthetic polymer. Pasut Decl. ¶¶ 36, 46, 51–53 and 55–59. Second, the PEG is connected to the CNP 38 via a linker, which breaks away under normal physiological conditions in the body post administration, releasing the CNP to interact with cells to promote cGMP and thereby stimulate bone growth. *Id.* ¶ 52 (per Ascendis scientist, "TransCon CNP [Yuviwel®] is a C-type natriuretic peptide (CNP-38) conjugated via a cleavable linker to a polyethylene glycol carrier molecule, designed to provide sustained systemic CNP levels upon weekly subcutaneous administration."), ¶ 53 (Ascendis: "TransCon CNP contains a linker that is stable under storage conditions at low pH but designed to initiate auto-cleavage and release of active, unmodified CNP-38 at physiological pH and temperature (37°C, pH 7.4) . . . ."). That cleavable linker is a "hydrolysable linkage" within the meaning of Claim 41, which a POSA would understand to be a connection capable of chemical reaction in which water reacts with another substance to form two or more new substances. Pasut Decl. ¶¶ 56 and 59. Ascendis disputes that the linker in Yuviwel® is "hydrolysable," and instead claims (now) that the cleavage is accomplished without any interaction with water. *See* Ex. 30, Prelim. Findings 421:12–13 ("[E]veryone is in agreement that 'hydrolysis' involves a reaction in which water breaks bonds."). But long before this litigation arose, Ascendis publicly characterized the sustained release mechanism of action in Yuviwel® as "autohydrolysis." Pasut Decl. ¶ 60. This admission is fully in keeping with the evidence recounted in Dr. Pasut's declaration, which shows that Yuviwel® uses a "hydrolysable linkage" that is cleaved through reaction with water, and demonstrates a more than sufficient likelihood that BioMarin will prevail on its infringement claim.[3]

---

[3] Because Claim 41 is directed to the formulation of Yuviwel® itself, and not a method of using that product in treatment, the inducement analysis for Claim 50 is not required. Ascendis would directly infringe Claim 41 by offering for sale, selling, or importing Yuviwel®. Liability is

2.    Ascendis Has No Likely Successful Validity Challenge

Issued patents are presumed valid. *See* 35 U.S.C. § 282. Ascendis has raised scattershot challenges to the validity of the RE'267 patent in the ITC investigation, but that proverbial ship has sailed. When the RE'267 patent was in reissue proceedings at the Patent Office, Ascendis lodged a protest under 37 C.F.R. 1.291, claiming that the patent was invalid and should not issue. By rule and standard practice, Ascendis was allowed to raise in that protest "[a]ny information which, in [Ascendis's] opinion, would make the grant of a patent improper." *See* Manual of Patent Examining Procedure (MPEP) § 1901.02. Given that full and fair opportunity, Ascendis raised only two challenges: (i) a claim that there was no proper technical basis to seek reissue; and (ii) a claim that the patent was invalid under 35 U.S.C. § 112 for lack of adequate written description. Ex. 31, Ascendis's Protest. The PTO considered Ascendis's arguments and ***rejected them***, allowing the RE'267 patent to reissue over Ascendis's objection. Although Ascendis now raises additional invalidity arguments in the ITC, it did not think enough of those arguments to even air them in its earlier protest to the Patent Office, which speaks volumes.

Ascendis bears the burden to prove invalidity by clear and convincing evidence. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("By challenging the validity of [an issued patent], [the patent challenger] bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the [alleged reference] as prior art."); *Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994) ("[T]he presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation."). It cannot come close.[4] As just one example, Ascendis appears to pin its hopes in the ITC primarily on the argument that the RE'267 patent is anticipated under 35 U.S.C. § 102(e) by BioMarin's own U.S. Patent No. 8,377,884 ("'884) and its WO counterpart (WO 2009/067639 ("WO639")). Ex. 32, the '884 patent; Ex. 33, WO639. Ascendis's

established if even one claim is infringed, of course.

[4] The disclosures of the RE'267 patent and the earlier provisional and non-provisional applications identified on the face of the RE'267 sufficiently disclose the claimed subject matter as required by 35 U.S.C. § 112. Therefore, asserted claims of the RE'267 are entitled to claim priority to those earlier provisional and non-provisional applications: May 20, 2009.

argument, which it did not deem worthy enough to include in its protest before the Patent Office, fails at every level.

First, the '884/WO639 references are not prior art under pre-AIA 35 U.S.C. § 102(e) ("pre-AIA 102(e)"), so the entire argument fails out of the gate. To qualify as prior art under pre-AIA 102(e), the portions of these references relied upon by Ascendis must be work "by another"—*i.e.*, not the work of the inventors. Pre-AIA 35 U.S.C. § 102(e). Ascendis contends that because the '884 patent lists different inventors than the RE'267 patent, it qualifies as prior art. However, one "must look beyond the superficial fact that the references were issued to different inventive entities. What is significant is not merely the differences in the listed inventors, but whether the portions of the reference[s] relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity." *Riverwood Intern. Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003). Here, Ascendis relies █████████████████████████████████████████████████████████ S*ee* Ex. 34, BioMarin's Opposition to Summary Determination at 2 and 15–17. These inventors ███████████████████████████████████████████████████████████████████ *See id*. at 4. Ascendis's anticipation theories ████████████ ████████████ *See id*. at 17–19. Accordingly, Ascendis cannot meet its burden to prove that the references qualify as pre-AIA 102(e) art and that threshold failure alone defeats its anticipation theory.

Second, even if they qualified as prior art, the '884/WO639 references do not disclose CNP 38, which is the required CNP variant asserted in method claim 50. S*ee* Ex. 34, BioMarin's Opposition to Summary Determination at 6 ("To be clear, the claims of the '884 patent do not recite the CNP variants of the domestic industry claims … CNP-38."). Thus, these references cannot apply to the asserted method claim, as anticipation requires a single reference to disclose every limitation arranged as claimed, not a curated selection of disparate disclosures. *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1368 (Fed. Cir. 2017). Ascendis's anticipation defenses, viewed fairly, will fail. To be sure, Ascendis throws virtually every other available

invalidity defense against the wall in the ITC (35 U.S.C. §§ 101, 103, 112 are all included in various ways), but each argument is as unavailing as the last, and in view of its failure to contest validity in the reissue successfully.  Indeed, the sheer breadth of Ascendis's scattershot approach to its invalidity defenses speaks volumes about its lack of faith in any one of them, and for good reason.  BioMarin is likely to succeed (again) in defending the validity of the RE'267 patent, and at a minimum has established the "fair ground for litigation" needed to raise "serious questions" on the merits. *Gilder*, 936 F.2d at 422.  As such, this factor too weighs in favor of the requested injunction.

## B.    BioMarin Would Suffer Irreparable Harm Absent An Injunction

If Ascendis is allowed to go forward with its planned launch of Yuviwel®, the harm to BioMarin and its relationships with the achondroplasia community would be immediate and irreparable.  *See i4i Ltd P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) (stating injuries to a patent holder like "loss of market share, brand recognition, and customer goodwill" "defy attempts at valuation" and are not adequately compensated with money damages), *aff'd*, 564 U.S. 91 (2011)*; Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages.").

***Damages to BioMarin's Reputation and Goodwill****.*  A launch of Yuviwel® before resolution of the ITC's investigation would perpetrate lasting damage to BioMarin's hard-won reputation among, and relationships with, healthcare professionals, patients, and families.  BioMarin has quite literally built the market for achondroplasia treatment in this country from scratch. Ash Decl. ¶ 29.  And it did not do so using the standard playbook of direct-to-consumer advertising that is common among large pharmaceutical companies. *Id*. ¶ 16.  Instead, BioMarin knew that reaching the small audience of eligible patients with this rare condition (approximately 2,400 in the US) would require a different approach. *Id*. ¶¶ 18-21, 29.  A major part of that effort involved educating doctors and specialists in the field about BioMarin's novel invention, and the benefits it could offer patients. *Id*. ¶¶ 33-34.  Introducing anything new to overworked healthcare practitioners is never easy, and that was especially true for Voxzogo®, which is intended for use by children. *Id*. ¶ 27.  In addition to developing trusted relationships with doctors, BioMarin also spent

years building relationships directly with achondroplasia patients, their families, and the advocacy groups that support them. *Id*. ¶¶ 43-48, 50. BioMarin's team of clinical care coordinators go wherever they are needed to offer help, including going to patients' homes to teach parents about how to administer injections and a host of other services tailored to the particular needs of each individual patient. *Id*. ¶¶ 43-48. These relationships that BioMarin has built are fundamental to the success of Voxzogo®, and are reflected in the steady increase in utilization of the product over time. *Id*. ¶ 53.

If Ascendis is allowed to enter the market, it will target patients who are already being safely treated with Voxzogo® (and their doctors) and will attempt to woo them away with untested promises of a superior product. Ex. 35, Ascendis FQ3 2025 Earnings Call (Ascendis touting its intention that many patients who are currently being treated with Voxzogo® will be switched to Yuviwel®). Those doctors who then encourage use of Yuviwel® and those patients who switch will have done so because they are convinced by Ascendis that Yuviwel® is "better" than Voxzogo® and without providing a warning that Yuviwel® could be removed from the market by the ITC. If the ITC later excludes Yuviwel® from the US market in a few short months ***because it uses BioMarin's own patented technology***, then doctors and patients will be left with only the product that they have been unfairly told is not as good. Even if the patients shift back to Voxzogo®, which is not a sure thing for the reasons discussed below, their view of BioMarin and its reputation will be unfairly tarnished.

Courts have uniformly recognized that damage to reputation and goodwill can constitute irreparable harm, and such a finding is particularly appropriate here given the unique efforts BioMarin has made and the relationships it has built in creating the market for achondroplasia therapy in this country. *See Fresenius Med. Care Holdings Inc. v. Baxter Int'l, Inc.*, No. C 03-cv-1431, 2008 WL 928496, at *3 (N.D. Cal. Apr. 4, 2008) ("It is well-established that harm to reputation as an innovator is an injury 'not compensable by damages.'" (citation omitted)), *aff'd in relevant part*, 582 F.3d 1288, 1302–03 (Fed. Cir. 2009); *see also Albany Molecular Rsch., Inc. v. Dr. Reddy's Lab'ys, Ltd.*, Civil Action No. 09-4638, 2010 WL 2516465, at *11 (D.N.J. June 14, 2010) ("[T]he loss of goodwill associated with the brand is the type of injury that is the definition

of 'irreparable.'" (citation omitted)); *AstraZeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 579, 613–14 (D.N.J. 2009), *supplemented*, 623 F. Supp. 2d 615 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010) (agreeing that there will be "confusion among consumers and physicians" known as the "yo-yo" effect, which occurs "when a [competing drug product] comes on and off the market quickly," thus negatively impacting the patentee's reputation).

***Loss of Critical Human Resources***.  In addition, allowing Ascendis to launch its infringing product would exact a very human toll on BioMarin's employees, and thus on the company itself. Ash Decl. ¶ 69.  The Voxzogo® product is supported by a team of twenty-four account managers spread throughout the US; four regional managers; and one overall leader.  *Id*. ¶ 30.  Unlike at larger pharmaceutical companies where account managers in the field may be responsible for multiple different products, the Voxzogo® team supports that product only.  *Id*. ¶ 31.  Each team member is highly skilled, and has to undergo a minimum of three months of training about the product and about achondroplasia, in addition to the constant and ongoing learning that they do to keep abreast of new testing and developments in the field.  *Id*. ¶ 32.  The Voxzogo® product is also supported by a dedicated, highly-experienced team of fifteen clinical care coordinators; two associate care directors; and one overall leader.  *Id*. ¶ 36.  This group provides dedicated services directly to patients and their families, tailored to the individual needs of each.  *Id*. ¶ 41.  Through home visits, phone calls, training presentations, and myriad other efforts, the care coordinators ensure that each patient and family understand Voxzogo® and how best to administer and store the product.  *Id*. ¶¶ 43-45.  They do the hard work to motivate patients and families and to care for them throughout the therapy, which can last for years.  *Id*. ¶ 47.

The relationships that the account managers and the clinical care coordinators have built over the years are irreplaceable.  Ash Decl. ¶¶ 46, 71.  If Ascendis is allowed to launch its directly competing product, at least some of these people will likely lose their jobs.  *Id*. ¶ 69.  They are dedicated solely to Voxzogo®, and BioMarin cannot effectively redirect them to other products.  *Id*. ¶ 70.  The cost to the individual employees is obvious.  *Id*. ¶ 69.  They will have to seek different employment in a competitive marketplace, which will be disruptive to them and the families who depend on them.  *Id*. ¶ 72.  And even if Yuviwel® is later excluded from the market, BioMarin may

not get these critical employees back. *Id*. ¶ 73. Their hard-earned experience and relationships will be lost to the company, and that value cannot be regained merely by hiring and training replacements. *Id*. ¶ 71. There is simply no good reason to inflict this harm on BioMarin's employees (and the company itself) over a drug product from Ascendis that may be excluded from the market in a few short months. *See AstraZeneca LP v. Apotex, Inc*., 623 F. Supp. 2d 579, 612 (D.N.J. 2009), *supplemented*, 623 F. Supp. 2d 615 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010) ("The Court agrees with AstraZeneca that the damage caused by a loss in personnel and the impact this would have on the company are indeed significant and unquantifiable.").

***Loss of Market Share and Sales***. Finally, although this injunction is primarily about preventing confusion and avoidable harm to the achondroplasia community over a new product that may (and should) not last, there can be no doubt that Ascendis's proposed launch would cause irreparable harm to BioMarin's sales and market share as well. Yuviwel® will compete directly with BioMarin's Voxzogo®. Indeed, it will be the *only* competitor, thus leaving no doubt that every sale Ascendis makes of its infringing product is a sale that otherwise should have gone to BioMarin, particularly given Ascendis's acknowledged plan to target existing Voxzogo® patients for switching. Courts have long recognized that "[d]irect competition in the same market . . . suggest[s] strongly the potential for irreparable harm[.]" *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012). In situations like this, "the patentee suffers the harm—often irreparable—of being forced to compete against products that . . . infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). The market share that BioMarin has earned over the last 5+ years would be eroded sale-for-sale by Ascendis's Yuviwel®. *See Illumina*, 207 F. Supp. 3d at 1094 ("Compensation for lost sales will not adequately remedy the harm [the alleged infringer] could do to Illumina's business absent an injunction."). This sort of inevitable "[l]oss of market share constitutes irreparable injury because market share is so difficult to recover … Moreover, [t]he right to exclude direct competition in a limited sphere, a right inherent in the grant of a patent, is irreparably harmed by the loss of sales and the competitive foothold that the infringer will gain." *In re Aflibercept Pat. Litig.*, No. 1:23-CV-97, 2024 WL 3423047, at *40–41 (N.D. W. Va. July 9, 2024) (*quoting Indivior*

*Inc. v. Dr. Reddy's Lab'ys. S.A.*, Civ. No. 17-7111, 2018 WL 3496643, at *12 (D.N.J. July 20, 2018) ("Given the size and nature of the [] patient population… a sale of [the biosimilar] would quite likely be a lost sale for [the patentee]." (citation omitted)), *aff'd sub nom., Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 2024-2009, 2025 WL 324288 (Fed. Cir. Jan. 29, 2025); *see also Abbott Lab'ys v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 843 (N.D. Ill. 2007), *aff'd*, 544 F.3d 1341 (Fed. Cir. 2008) ("[L]oss of market position resulting from competitor's entry in a pharmaceutical patent infringement case may support a finding of irreparable harm.").

BioMarin "has a right, granted by Congress, not to assist its rival with the use of proprietary technology," and that right should be upheld here. *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D. Del. 2007); *see also Eli Lilly*, 609 F. Supp. 2d at 786 (granting preliminary injunction to bar launch of generic drug, noting even limited entry "would result in a rapid loss of market share and revenue that [would] be difficult, if not impossible for Lilly to recover, even if the Court were later to rule in favor of Lilly and [the generic product] was removed entirely from the market."). And the fact that BioMarin has never licensed the RE'267 patent to any third party shows that the company has prized this right of exclusivity over simple monetary value. Kheradiya Decl. ¶ 6; *see Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*, No. 14-cv-02864, 2018 WL 3036759, at *3 (N.D. Cal. June 9, 2018) ("The fact that [patentee] has never licensed the '866 patent indicates that harm suffered by [patentee] cannot be fully redressed by money payment."), *aff'd*, 773 F. App'x 623 (Fed. Cir. 2019).

Ascendis may claim that any loss of market share or sales suffered by BioMarin would be only transitory, but there is no reason the Court should make that assumption, particularly in this case. If Ascendis launches Yuviwel® now, and makes good on its stated plan to switch over existing patients who are well-treated on Voxzogo®, then BioMarin faces an unfair and horrible choice. If BioMarin wins at the ITC (as it should), it would be forced to either seek an exclusion order that would take Yuviwel® away from those patients, or else allow them to continue with Yuviwel® and thus reward Ascendis for its infringement and for all of the confusion and uncertainty it brought on patients and their caregivers. And even if the ITC **were** to enter a broader exclusion order, there is no guarantee that the patients would come back to Voxzogo®. Far from it.

Achondroplasia patients tend to be on therapy for years. Ash Decl. ¶ 47. Indeed, Voxzogo® is indicated for use with children from birth, and Yuviwel® is indicated for use with children as young as 2 years old. *Id.* ¶ 27. The patients ideally remain on therapy until their growth plates are closed, around age 16. *Id.* ¶ 26. And both of these products are administered via injection. Patients naturally experience treatment fatigue, especially as they get older. *Id.* ¶ 58. It is BioMarin's expectation that a number of patients who shift to Yuviwel® will elect to discontinue therapy completely if that product is taken back off the market in a few months, rather than going through the hassle of switching back. *Id*. This is especially likely because, as discussed above, it appears to be Ascendis's intention to promote its product by smearing BioMarin, making it even less certain that the inevitable loss in market share could ever be recovered fully. *See Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, No. 15-CV-3654, 2016 WL 5348866, at *14 (D.N.J. Sept. 23, 2016) ("[M]arket share, once lost, is difficult to regain in the event of a mistaken denial of injunctive relief."); *Illumina, Inc. v. BGI Genomics Co.*, No. 19-CV-03770, 2020 WL 3186921, at *10 (N.D. Cal. June 15, 2020) (recognizing that defendant's expansion into the market will create a two-player market and translate to lost revenue for patentee).

## C.   The Balance of Harms Leans Sharply To BioMarin and Favors Maintaining The Status Quo Until The ITC's Final Initial Determination On The Merits

When deciding on a preliminary injunction the Court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1457 (Fed. Cir. 1988); *see also Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 994 (Fed. Cir. 1985) ("It is well settled that the purpose of an interlocutory injunction is to preserve the status quo."). This balance tips "sharply" in BioMarin's favor under the sliding-scale test, *All. for the Wild Rockies*, 632 F.3d at 1134–35, and it plainly favors BioMarin under the four-factor analysis, *see Hybritech Inc.*, 849 F.2d at 1457.

As shown above, without the requested injunction, BioMarin will suffer irreparable harm from being forced to compete against its own inventions, which will inevitably damage the company in ways that cannot be repaired by a monetary award if the ITC later determines that Yuviwel® is infringing. In stark contrast, the only possible harm to Ascendis from the brief

injunction sought here is that—*if* Ascendis ultimately prevails in the ITC—its entry into the market would have been delayed by a few months, and it will have lost a certain amount of sales of Yuviwel® during the injunction period.  In other words, Ascendis will have lost some money.  But that is precisely what an injunction bond is designed to address, and Ascendis can be made whole for the money lost over the few months at issue.  That prospect of financial loss cannot tip the "balance" in Ascendis's favor and against an injunction here. *See In re Aflibercept Pat. Litig.*, 2024 WL 3423047, at *56 (noting that granting a preliminary injunction was supported in part by the bond requirement of Fed. R. Civ. P. 65(c), as "a bond will ensure Formycon will be compensated for any lost revenue in the event the Court's injunction is later reversed.").

Moreover, Ascendis's position is one of its own making.  It could have pursued true innovation and at least tried to develop a novel therapy to treat achondroplasia, but instead it elected to use BioMarin's invention, with full knowledge of BioMarin's patent rights—and continued to do so even after failing in its bid to have the patent declared invalid at the Patent Office.  That path carried an obvious risk that BioMarin would seek to enforce its rights and to block the launch of Yuviwel® at least until the infringement dispute can be sorted.  The natural consequence of Ascendis's actions cannot be seen as a true harm. *See Pfizer*, 429 F.3d at 1382 (affirming equities favor a patentee even when an alleged infringer had built a manufacturing facility for its accused drug product and was prepared to launch, because that is "simply a risk it took with eyes open to the consequences." (internal quotation marks omitted)).  Similarly, the fact that Yuviwel® has been approved by the FDA cannot tip the scales in Ascendis's favor. *See BGI Genomics*, 2020 WL 3186921, at *11 ("[C]ourts regularly find that a potential infringer's interest in entering the market pending outcome of patent litigation does not outweigh the plaintiff's interest in its patents … This is so even where, as here, a new entrant to a market could benefit the public by bringing medically-important products to market." (internal citation omitted)).

**D.     The Public Interest Strongly Favors The Limited Injunction Requested**

The public interest especially favors the limited injunction sought by BioMarin.

***First***, the relevant "public" here—patients with achondroplasia—will be well served by the brief injunction requested here.  BioMarin only seeks an injunction for a few months until Chief

Judge Cheney can issue the final initial determination of the ITC.  Until then, patients will continue to have full access to Voxzogo®.  Kheradiya Decl. ¶ 27.  Until February 27, 2026, Voxzogo® was the only available FDA approved treatment.  And indeed, Voxzogo® remains the ***only*** drug approved for use with patients younger than 2 years of age (Ascendis is only approved for children 2 and over).  Voxzogo® has been on the market since 2021, and is the most tested treatment for achondroplasia ever.  It offers real world, experiential evidence of safety and efficacy that Yuviwel®—which has only been tested in clinical trials with carefully selected subjects—cannot match.[5]  So, the medical needs of patients are, and will continue to be, amply met during the brief injunction period sought.

If the injunction is not granted, by contrast, Ascendis's launch of Yuviwel® with the specter of a near-term infringement ruling and exclusion order will inevitably cause confusion among patients, caregivers, and healthcare practitioners.  How could it not?  If families are considering whether to switch their child from Voxzogo® over to Yuviwel®, how are they to make sense of what may or may not happen in the litigation, and how that will impact their access to medication?  And while Ascendis's CEO has touted the fact that the labeling for Yuviwel® instructs patients about how to switch over to that product from Voxzogo®, Ascendis has not warned potential new patients of the risk that Yuviwel® may not be available in the near future.  Ascendis also has not provided instruction for how to switch *back* if they choose (or are required) to do so in the future.  *See* Ex. 4, Ascendis News Conference Regarding Yuviwel® Approval at 7 (Ascendis's CEO stating "[t]here is even switch guidance within this U.S. prescribing information. Start once-weekly YUVIWEL on the day after completing the last dose of daily CNP therapy.").  Moreover, no matter what the ultimate scope of the ITC's exclusion order, a premature launch by Ascendis now ahead

---

[5] Ascendis has asserted that Yuviwel® is administered via a once-weekly injection, and claims that this will improve patient adherence over Voxzogo®, which is once-daily.  Ash Decl. ¶ 65.  But again, those claims are unproven.  While there may be some superficial appeal to the idea that patients might prefer weekly injections over daily, and that might therefore lead to greater adherence, BioMarin's real world experience is that families often value the ritual of daily administration and have made it an important part of their relationship with their child with achondroplasia.  *Id*.  This anecdotal evidence is borne out in long-range studies of patient behavior.  *See, e.g.*, Ex. 36, Miller Article (showing that patient adherence to daily treatment is driven by the efficacy in growth benefits).

of the ITC trial will result in a situation where some patients may continue to have access to Yuviwel®, while others will not. This is yet more confusion and hassle for patients, families, and doctors, disrupting medical treatment—all at Ascendis's own doing.

*Second*, "[i]t is well-established that the public has a substantial interest in the enforcement of patent rights, in light of the fact that the protection of those rights promotes investment by drug companies in research and development." *Eli Lilly*, 609 F. Supp. 2d at 812; *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383–84 (Fed. Cir. 2006); *Pfizer*, 429 F.3d at 1382; *Abbott Lab'ys*, 500 F. Supp. 2d at 846 (although there is "public interest in competition in the pharmaceutical market," the resources expended by the innovator/patentee in creating these products must be given substantial weight); *Monsanto Co. v. Scruggs*, 249 F. Supp. 2d 746, 760 (N.D. Miss. 2001) ("The public interest is not served by allowing an infringer to profit at the expense of [a patent] holder.").

*Third,* the injunction proposed by BioMarin is unusually limited in duration (only until the ITC's final initial determination) and is narrow in scope to be commensurate with BioMarin's patent rights. *See, e.g.*, *Hoffmann-La Roche Inc. v. Cobalt Pharms. Inc.*, Civil Action No. 07–4539, 2010 WL 4687839, at *1 (D.N.J. Nov. 10, 2010), *modified sub nom,. Hoffmann-La Roche Inc. v. Watson Lab'ys, Inc.*, Civil Action No. 07-4539, 2012 WL 458435 (D.N.J. Feb. 9, 2012) (noting Roche needed to move for a preliminary injunction since the 30-month stay on the FDA's approval for Cobalt's generic was soon to expire and the court had not yet ruled on the merits of the infringement dispute); *Eisai Co., Ltd v. Teva Pharms. USA, Inc.*, Civ. No. 05–5727, 2008 WL 1722098, at *1 (D.N.J. Mar. 28, 2008) (same).

## V.    **CONCLUSION**

For all of these reasons, BioMarin readily satisfies either of the applicable tests for a preliminary injunction, and it respectfully requests that the Court enter an Order in the form attached, barring Ascendis from using, selling, offering for sale, selling, or importing into the United States the Yuviwel® product until after ITC has had the opportunity to hear the merits of the dispute and render an initial determination.

Dated:                                   Respectfully submitted,

_____

Edward R. Reines (SBN 135960)
ereines@jonesday.com
S. Christian Platt (SBN 199318)
cplatt@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:   (650) 739-3939
Facsimile:    (650) 739-3900

Jason G. Winchester (*pro hac vice* pending)
jgwinchester@jonesday.com
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone:   (312) 782-3939
Facsimile:    (312) 782-8585

Gasper J. LaRosa (*pro hac vice* pending)
gjlarosa@jonesday.com
Sabrina A. Bellantoni (*pro hac vice* pending)
sbellantoni@jonesday.com
Lauren H. Kim (*pro hac vice* pending)
lkim@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone:   (212) 326-3939
Facsimile:    (212) 755-7306

Attorneys for Defendant, Counterclaim-Plaintiff
BIOMARIN PHARMACEUTICAL INC.